IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ELDEN BENDA

    Petitioner,                No. 1:06-cv-01044 ALA HC

    vs.

JAMES D. HARTLEY, Warden

    Respondent.             ORDER

_____/

    Pending before the Court are Elden Benda's ("Petitioner") application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(a) (Doc. 1), Respondent's Answer (Doc. 15), and Petitioner's Reply (Doc. 19). Also before the Court are the parties' briefs filed in response to this Court's December 19, 2007 order requesting additional briefing on the applicability of *Irons v. Carey*, 505 F.3d 846 (9th Cir.2007), to this matter. For the reasons discussed below, Petitioner's application is denied.

**I**

**A**

    On July 26, 1991, the San Diego County Superior Court found Petitioner guilty of two counts of attempted murder with premeditation in violation of California Penal Code sections 664, 187, and 189. Petitioner was sentenced to life with the possibility of parole.
/////

**B**

The probation report prepared for the trial court's sentencing proceedings described Petitioner's crime as follows:

> THE OFFENSE:
> Ms. Isaacs was granted a restraining order on the [Petitioner] after the termination of their relationship . . . . On at least four different occasions . . . [Petitioner] called Ms. Isaacs wanting to get back together . . . . [Petitioner] threatened to kill Ms. Isaacs . . . . On 1-17-91 . . . [Petitioner] walked into . . . the office of Ms. Isaacs . . . . [Petitioner] stated that he wanted Ms. Isaacs to drop the charges that were filed against him in a Misdemeanor Domestic Violence case.  Ms. Isaacs said that she could not do that . . . [Petitioner] then took out a loaded .380 caliber semi-automatic handgun out of his pocket and asked Ms. Isaacs, "Do you want to die?" Ms. Isaacs had picked up the phone to call the police and when the gun was pulled out, she hung the phone up . . . . [Petitioner] then began to walk towards the front door of the reception area.  Co-worker Gary Binkley met up with [Petitioner] near the door . . . . A short period of . . . wrestling occurred . . . with Binkley and [Petitioner] . . . . As [Petitioner] and Binkley struggled, [Petitioner's] right arm went up . . . . In [Petitioner's] hand was the gun and [Petitioner] then pointed it down into Binkley's face . . . . There was [sic] approximately six feet between [Petitioner] and Isaacs with the glass window separating them. [Petitioner] fired the handgun at Isaacs, hitting her in the left forearm . . . . Isaacs then ran out of the office . . . . As she was running trying to get [Petitioner] away from the office and her co-workers, she encountered [Petitioner] . . . . As Isaacs met up with [Petitioner], he grabbed her by the hair with Isaacs begging him not to kill her.  Isaacs was in a crouched position . . . . The gun was approximately two inches away from her temple when she heard a "click" as it jammed while [Petitioner] attempted to fire it.  [Petitioner] then let go of Isaac's [sic] and began banging the gun and pulling back and forth on top of it, to get it to work . . . . [Petitioner] then walked backwards towards the elevator . . . . During this time a delivery man, Clayton Arnett came on to the scene and was going to try to intervene . . . . [Petitioner] then pointed the gun at Arnett . . . . [Petitioner] got into his vehicle and left the parking lot . . . . Jeffrey and Richard Kelley were making a delivery when they were told that [Petitioner] had just shot someone.  They followed [Petitioner] in their truck . . . to get [Petitioner's] license number . . . . [Petitioner] then slowed down to the point where his vehicle was even with Kelley's, with [Petitioner's] car being on the right side of Kelley's . . . . [Petitioner] held his gun across his body and outside the driver's side window and pointed it at Jeffrey and Richard Kelley.  Kelley's truck hit a curb and ceased following [Petitioner's] vehicle . . . . [T]he same day, [Petitioner] called from a pay phone . . . wanting to turn himself in.

Probation Report, Answer Ex. C at 3-4.

**II**

On January 7, 2004 ("2004 Decision"), the California Board of Prison Terms ("BPT") decided that Petitioner was unsuitable for release on parole.  The BPT's decision denying

Petitioner parole reads as follows:

> This Panel . . . has reviewed all information . . . and relied on the following circumstances in concluding that [Petitioner is] not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety, if released from prison at this time. The paramount reasoning . . . would be the timing and the gravity of the committing offense. This offense was carried out in a vicious and brutal manner. The offense was carried out in a manner which demonstrates exceptionally insensitive disregard for human suffering. And the motive for the crime was inexplicable and very trivial in relationship to the offense . . . . Peggy Isaacs was the victim in this particular incident . . . . [T]here were multiple victims and because of your actions . . . other possible victims [were] present at the time. Because you went to her place of employment, you armed yourself with a handgun. And you shot this victim . . . . The victim was trying to get away. You chased this victim, you put her on the floor and you grabbed her, forcing her to kneel down and then you tried to shoot her again. By the grace of God . . . this gun misfired, it jammed. By the grace of God, she managed to get away and you fled the scene . . . . Previous record, you had an escalating pattern of criminal conduct, a history of unstable and tumultuous relationships with others, coming from a dysfunctional family setting, problems developing from substance abuse of alcohol and drugs that continued from an early age. And you failed to profit from society's previous attempts to correct your criminality. You had a stint in a boys' camp around the age of 15 for a B & E, breaking and entering, an unstable history of prior criminality, and some minor traffic violations as well . . . . [Y]ou have not sufficiently participated in beneficial self-help programming at this time. The psychological report . . . . is not totally [in] support of release at this time . . . . [T]he doctor writes that [Petitioner] has a serious substance abuse or substance use problem and use of drugs and alcohol played a role in his crime.
> "He has yet to immerse himself in a serious recovery program."
> The prisoner lacks realistic parole plans. He does not have a residential plan . . . nor does he have acceptable employment plans at this time . . . . Panel makes the following findings: That the prisoner still needs some self-help in order to face, discuss, understand and cope with stress in a nondestructive manner, to better understand the causative factors . . . Why you went out on this particular day in time and tried to end the life of Peggy Isaacs. Until progress is made, the prisoner continues to be unpredictable and a threat to others. Nevertheless, . . . you should be commended. Only one 115 in your entirety. You've participated in a Lifers' Group, Alternative to Violence in 2002, the Personal Growth seminar. You've just begun to deal with the substance abuse problem in the 12-Steps . . . . Positive work reports, excellent to above average, as a Maintenance Mechanic . . . . However, all of these positive aspects of your behavior don't outweigh the factors of unsuitability at this time.

BPT January 7, 2004 Decision ("2004 Decision"), Answer Ex. B at 49-53.

Petitioner challenged the parole denial in a state habeas corpus petition.

On May 11, 2005, the San Diego County Superior Court denied Petitioner's petition for a writ of habeas corpus. The Superior Court concluded that the BPT's decision was supported by

3

some evidence and that the BPT did not err in deciding that Petitioner was unsuitable for release on parole. The Superior Court's order reads as follows:

> Petitioner is . . . claiming that the BPT violated his due process rights at that January 7, 2004, hearing, when it did not consider his suitability in a manner consistent with legislative intent and Penal Code [section] 3041 and there was not "some evidence" presented at the hearing to justify the denial of his parole.
> Petitioner is . . . contending that . . . the BPT is systematically biased in its decision-making and acting in a [sic] arbitrary and capricious manner depriving him of a fair and impartial hearing . . . .
> "So long as the Board's finding of unsuitability flows from pertinent criteria, and is supported by "some evidence" in the record before the Board (In Re Rosenkrantz (2002) 29 Cal.4th 616, 658), the overriding statutory concern for public safety in the individual case trumps any expectancy the indeterminate life inmate may have in a term of comparative equality with those served by other similar offenders.
> Petitioner . . . sets forth all of the reasons why he believes his case is really no more "exceptionally callous" or "inexplicable or very trivial" than other cases.
> This Court will not second-guess the BPT regarding these factors, because the Board clearly set forth why it believed that this particular attempted murder (that did not become murder only because Petitioner's gun jammed while he held the victim by the hair at her workplace and tried to shoot her a second time – this time in the head) "demonstrated that the act was carried out in a vicious and brutal manner and was an exceptionally insensitive disregard for human suffering."
> While Petitioner may not agree with this description of the crime, the Court will not overturn that opinion for at least three reasons: (1) As noted, the Court will not second guess the Board because it heard all the evidence presented and made the finding, (2) The Board specifically noted that Petitioner still does not understand the reasons why and how drugs and alcohol contributed to this crime because he blacked out and still does not recall the details, and; (3) Because there are other factors listed in 15CCR 2402 that the Board correctly considered and found wanting for this particular Petitioner.
> The Board set forth in full details all the reasons why it believed this particular attempted murder was "carried out in a vicious and brutal manner."
> [T]he BPT was still concerned with Petitioner's unstable social history and his reliance upon drugs and alcohol. The BPT was particularly concerned that despite being incarcerated for 13 years, Petitioner had not been participating in substance abuse self-help programs.
> Although not listed as a factor in section 2402, the BPT always seriously considers the parole plans each Petitioner has in place if parole is granted. Here, the Board found that "the prisoner lacks realistic parole plans" and had no acceptable employment plans.
> Finally, . . . the Court declines to disagree with the BPT's findings: . . . "That the prisoner still needs some self-help in order to face, discuss, understand and cope with stress in a nondestructive manner, to better understand the causative factors, . . . the prisoner continues to be unpredictable and a threat to others."

Superior Court Order, Pet. Ex. I at 2-5.

Petitioner then filed a petition for writ of habeas corpus in the California Court of Appeal. That Court denied Petitioner's request for relief on August 24, 2005. The Court of Appeal's order reads as follows:

> On January 7, 2004, the Board of Prison Terms conducted a . . . parole consideration hearing and declined to set a parole date, finding Benda would pose an unreasonable risk of danger to society if released. The Board based its decision primarily on the "vicious and brutal" manner in which Benda attempted to murder his former girlfriend. The Board noted Benda had significant substance abuse problems at the time of the crime which he has not addressed, he does not have realistic parole plans in San Diego County and has an unstable social history. The Board commended Benda for his excellent work history and positive behavior in prison. Benda contends he has been denied due process because "the Board is systematically biased in their [sic] decision making, acting in the most arbitrary and capricious manner depriving him of the fair and impartial hearing to which he is entitled." Benda claims the decision is not supported by any evidence.
> Benda raised these claims in his petition for habeas corpus in the San Diego Superior Court (HC17133). The petition was denied by comprehensive order on May 11, 2005. We adopt the reasoning in the superior court's order.
> The petition is denied.

California Court of Appeal Order, Pet. Ex. J at 1.

Petitioner subsequently filed a petition for writ of habeas corpus before the California Supreme Court. That Court summarily denied Petitioner's petition on June 28, 2006. Petitioner filed a timely application for a writ of habeas corpus in this Court pursuant to 28 U.S.C. § 2254(a) on August 9, 2006.

**III**

**A**

An application for a writ of habeas corpus on behalf of a person in custody pursuant to a state court judgment "shall not be granted with respect to any claim that was adjudicated on the merits" in state court unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination

of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In determining whether the California courts erred in holding that Petitioner had failed to demonstrate that his federal constitutional rights have been violated, this Court must look to the decisions of the San Diego County Superior Court and the California Court of Appeal as the last reasoned state court opinions addressing Petitioner's arguments. See *Franklin v. Johnson*, 290 F.3d 1223, 1233 n. 3 (9th Cir.2002) (explaining that when a subsequent appeal is denied without comment, a federal court must look to the last state court decision that actually addresses a claim).

**B**

Petitioner alleged in his § 2254(a) application that "petitioner's due process rights have been violated" and that "petitioner was denied a fair and impartial hearing" by the BPT because it conducted parole consideration hearings in an "arbitrary and capricious . . . manner." Pet. at 13. Petitioner makes several claims. First, he argues that California Penal Code "section 3041(a) requires the BPT to undertake a comparative analysis by measuring the petitioner's criminal conduct against that of others convicted of the same offense, whose conduct was of similar gravity and magnitude in respect to their threat to the public." Pet. at 19. Second, he argues that "[t]he decision rendered by the Board . . . is unsupported by the record even when applying the . . . some evidence standard." Pet. at 18-19. Lastly, Petitioner alleges that his incarceration violates due process because the BPT relied on the nature of his commitment offense as some evidence that he was unsuitable for parole. Pet. at 35. Petitioner maintains that the BPTs "continued reliance on unchanging circumstances [of the commitment offense] transforms an offense for which California Law provides eligibility for parole into a de facto life imprisonment without the possibility of parole." Pet. at 35.

This Court construes this as a procedural due process claim. "A procedural due process claim has two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections.'" *McQuillion v. Duncan*,

1  306 F.3d 895, 900 (9th Cir.2002) (quoting *Brewster v. Bd. of Educ. of Lynwood Unified Sch.*
2  *Dist.*, 149 F.3d 971, 982 (9th Cir.1998)).

### C

As to procedural protections, in *Superintendent v. Hill*, 472 U.S. 445, 454, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985), the Supreme Court held that "revocation of good time does not comport with 'the minimum requirements of procedural due process,' unless the findings of the prison disciplinary board are supported by some evidence in the record." (Citation omitted).  The Ninth Circuit has held that the "some evidence" standard announced in *Hill* applies to parole release proceedings.  *Irons*, 505 F.3d at 851.

Respondent argues that the some evidence test established in Irons does not apply to the parole context because the application of the test in this context is not clearly established federal law.  Respondent concludes that "[b]ecause the some evidence standard was developed in the context of a different level of liberty interest, it cannot be considered as clearly established Supreme Court authority for purposes of AEDPA when reviewing state court adjudications for parole suitability decisions." Answer at 7.  Respondent also contends that this Court is not bound by Irons, because circuit law has no precedential effect under AEDPA.  However, this Court cannot contravene the Ninth Circuit's holding that the some evidence standard applies to parole cases.  *See Zuniga v. United Can Co.*, 812 F.2d 443, 450 (9th Cir.1987) (citation omitted) ("District courts are, of course, bound by the law of their own circuit, and 'are not to resolve splits between circuits no matter how egregiously in error they may feel their own circuit to be.'").

"To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.  Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.'" *Id*. at 1128 (quoting *Hill*, 472 U.S. at 455-56).  "*Hill*'s some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary.'" *Id.* at 1129 (quoting *Hill*, 472 U.S. at 457).

### IV

### A

Petitioner argues that the BPT cannot deny him a parole release date based on the nature of his commitment offense. The Ninth Circuit has rejected this conclusion in *Irons*. There, the Court stated:

> where, as here, there is some evidence to support a finding that "the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering" and the "motive for the crime is inexplicable or very trivial in relation to the offense," Cal. Code Regs., tit. 15 § 2402(c)(1)(D)-(E), we cannot say that the state court unreasonably applied *Hill*'s "some evidence" principle.

*Id*. at 853.

Petitioner notes that he has reached his minimum eligible parole date. Petitioner attempts to distinguish his case from *Irons* on the ground that the decision in *Irons* to deny habeas relief was made before the inmate had served the minimum number of years required by his sentence. Petitioner maintains that "continued use of commitment offense facts to find . . . an inmate [who] had exceeded his minimum term" constitutes "a due process violation." Petr' Br. in Resp. to Ct. Order at 2. The holding in *Irons* does not support this conclusion. The Ninth Circuit limited its holding in *Irons* as follows: "All we held in [ *Sass*, 461 F.3d at 1125 and *Biggs v. Terhune*, 334 F.3d 910, 912 (9th Cir.2002) ] and all we hold today, therefore, is that, given the particular circumstances of the offenses of these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms." *Irons*, 505 F.3d at 853-54. In an unusual comment in *Irons*, the panel expressed its aspiration that some future court decision will conclude that the BPT has the duty to grant parole where "there was substantial evidence in the record demonstrating rehabilitation." *Id*. at 854. The Court stated:

> We hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes.

*Id.*

The *Irons* panel did not cite any authority to support its prognostication that the denial by the state court of habeas corpus relief when the minimum term has been served would be

8

"contrary to, or involve[ ] an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States" in violation of 28 U.S.C. § 2254(d)(1). No presently binding Ninth Circuit decision has fulfilled the prediction of the *Irons* 's panel.

In the precedential portion of the *Irons* decision, the Court held that "we must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision holding that these findings were supported by 'some evidence' constituted an unreasonable application of the 'some evidence' principle articulated in *Hill*." *Irons*, 505 F.3d at 851. Under California law, the circumstances tending to show unsuitability are:

> (1) the prisoner committed the offense in an especially heinous, atrocious, or cruel manner;
> (2) the prisoner has a previous record of violence;
> (3) the prisoner has an unstable social history;
> (4) the prisoner has committed sadistic sex offenses;
> (5) the prisoner has a history of mental or psychological problems; and
> (6) the prisoner has engaged in serious misconduct while in prison.

Cal.Code Regs., tit. 15 § 2402(c).

Factors to be considered in determining whether a crime was "especially heinous, atrocious or cruel" include:

> (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
> (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
> (C) The victim was abused, defiled or mutilated during or after the offense.
> (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
> (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

Cal.Code. Regs., tit. 15 § 2402(c)(1).

In *Irons*, this Court held that a prisoner's commitment offense, on its own, may justify parole denial if "the Board can 'point to factors beyond the minimum elements of the crime for which the inmate was committed' that demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if released." 505 F.3d at 852 (quoting *Dannenberg*, 34 Cal.4th 1061,1071, 23 Cal.Rptr.3d 417, 104 P.3d 783 (2005)). The *Irons* Court stated that

> [f]actors beyond the minimum elements of the crime include, *inter alia*, that "[t]he offense was carried out in a dispassionate and calculated manner," that "the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and that "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." Cal. Code, Regs., tit. 15 § 2402(c)(1)(B), (D)-(E).

*Id.*

Pursuant to binding Ninth Circuit precedent, Petitioner's commitment offense on its own justified the BPT's denial if the BPT's decision was based on factors beyond the minimum elements of the crime, and demonstrated that the inmate would have, at the time of the suitability hearing, presented a danger to society if released.

**B**

Petitioner contends that the BPT's finding that his commitment offense was especially heinous was not supported by some evidence. The record shows that the BPT's decision that Petitioner was unsuitable for release on parole based on his commitment offense was supported by some evidence and based on factors beyond the minimum elements of the crime. Petitioner was convicted of attempted murder with premeditation. In its decision, the BPT stated that Petitioner "committed the offense in a vicious and brutal manner." The BPT explained that Petitioner

> went to the victim place of employment . . . armed . . . with a handgun, . . . where [he] shot the victim [who] fell to the floor . . . unable to get up and run away [at which time he] chased the victim . . . and made her kneel on the ground by grabbing her by her hair . . . and put the gun to her head again . . . and pulled the trigger.

2004 Decision at 54.

The BPT reasoned that "the victim was already wounded, and yet [Petitioner] tried to finish her off." The BPT also noted that "the motive for the crime was inexplicable and very trivial . . . trying to be possessive and controlling over another human being." The BPT's reasons go beyond the minimum elements of the crime, and speak to the inherently egregious nature of the offense. Therefore, the BPT's decision was supported by some evidence. For the same reason, the California Court of Appeal's order upholding the BPT's decision was not a decision that was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d).

10

V

The BPT also relied on other factors in finding that Petitioner would pose an unreasonable risk of danger to society and a threat to public safety if he were released. The BPT was concerned with Petitioner's substance abuse problem. The BPT relied on Petitioner's own testimony that he was under the influence of drugs and alcohol at the time of the crime. In addition, the BPT relied upon a staff psychologist's report, which stated that drugs and alcohol played a role in his offense and that Petitioner "has yet to immerse himself in a serious recovery program." The BPT was particularly concerned that despite being incarcerated for thirteen years, Petitioner had only been participating in substance abuse self-help programs for two and a half months. Lastly, in reaching its decision to deny parole, the BPT also relied on Petitioner's statement that he does not have any plans for residence or employment in California if paroled.

Petitioner disputes the BPT's finding that Petitioner was not suitable for release on parole because he has a history of unstable relationships with others, an escalating pattern of criminal conduct, and the District Attorney opposes Petitioner's release. This Court need not reach these arguments because the BPT's decision was supported by some evidence of other factors set forth in California Penal Code section 2402(c).

VI

Petitioner also contends that "[t]he Board failed to comply with the mandate of section 3041 because it did not determine whether petitioner was suitable for release in a manner that will provide uniform terms as required by subdivision (a)." Pet. at 19. Petitioner claims that "[t]he language of section 3041(a) requires the Board to undertake a comparative analysis by measuring the petitioner's criminal conduct against that of others convicted of the same offense, whose conduct was of similar gravity and magnitude in respect to their threat to the public." *Id.*

In *Irons*, the Ninth Circuit has held that "a determination of an individual inmate's suitability for parole under *section 3041, subdivision (b)* must precede any effort to set a parole release date under the uniform-term principles of *section 3041, subdivision (a)*." 505 F.3d at 851 (quoting *Dannenberg*, 34 Cal.4th at 1079-80). Thus, the Board did not violate Petitioner's due process rights when it declined to set a parole release date because it concluded that setting a

parole release date would be premature for reasons of public safety.

## Conclusion

The BPT's finding that Petitioner is unsuitable for release on parole because he poses an unreasonable risk to public safety is supported by some evidence that outweighs the suitability factors based on his performance while imprisoned. Thus, the state court's denial of his petition was not "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d).

Therefore, it is hereby ORDERED that Petitioner's application for habeas corpus relief is DENIED. The clerk is directed to enter judgment and close the case.

/////

DATED: July 21, 2008

/s/ Arthur L. Alarcón
_____
UNITED STATES CIRCUIT JUDGE
Sitting by Designation